IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC REYES, #346816 *

Plaintiff, *

v. * Civil Action No. WMN-15-1433

DEPARTMENT OF CORRECTIONS, *et al*. *

Defendants. *

*****

**MEMORANDUM**

On May 19, 2015, the Court received for filing inmate Eric Reyes's self-represented 42 U.S.C. § 1983 civil rights action, dated May 13, 2015. The Complaint seeks miscellaneous injunctive relief and damages from the Maryland Department of Corrections, the Wardens at the Jessup Correctional Institution ("JCI") and the Maryland Correctional Institution in Hagerstown ("MCIH"), Physician's Assistants ("PA") Moss and Richards, and a number of "John Doe" Medical and State Correctional Defendants.[1] Defendants Moss, Department of Corrections, Dovey and Wolfe have filed Motions to Dismiss or, in the Alternative, Motions for Summary Judgment (ECF Nos. 16 & 22), as well as legal memorandum (ECF Nos. 16-3 & 22-1)[2] (collectively, "Motions"), a Motion to Seal (ECF No. 15) and a number of exhibits consisting of hundreds of pages.[3] Reyes has filed an Opposition (ECF No. 20) and Defendant Moss has filed a Reply. ECF No. 24.

---

1 Service or process was not accepted on behalf of "John Doe" Defendants or PA Richards.

2 All exhibits are referenced by their electronic filing number.

3 The exhibit at ECF No. 15-2 consists of 262 pages, while the exhibit at ECF No. 22-1 is comprised of 389 pages.

The matter is ready for disposition, no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014). For reasons that follow, Defendants' Motions (ECF Nos. 16 & 22), construed as motions for summary judgment, ARE GRANTED.[4]

**I. Background**

Reyes, who is currently confined at the MCIH, filed this self-represented Complaint alleging that while incarcerated at JCI in December of 2012, he was stabbed several times in the chest, back, neck, heart, and cervical disks, causing him spinal cord injury, hemopneumopericardium,[5] neck pain, muscle weakness, numbness on the right side of his body, gait disturbance, and other conditions. He claims he received open-heart surgery and was discharged to an orthopedic and rehabilitation hospital for therapy, where he was provided a wheelchair because he could not walk, and later received a rolling walker, a single-point cane, physical therapy, and Lyrica and Oxycodone for pain. ECF No. 1 at pp. 11-12. Reyes asserts that he was transferred from the hospital to JCI and received inadequate physical therapy. *Id*. at pp. 12-13. He claims that JCI transportation officers refused to place him in front handcuffs so he could use his cane.

Reyes further alleges that although informed that his cane was with his property, it was later missing. *Id.* at p. 13. He contends that when he asked PA Moss about his cane, Moss told him he did not need a cane and refused to give him one. Reyes states that he is still without the cane taken by JCI custody officers or a rolling walker, no physical therapy has been given to him

---

[4] PA Moss moves to seal the medical records attached to his dispositive motion. ECF No. 15. The Motion shall be granted and the Clerk shall place all documents found in the exhibit at ECF No. 15-1 under seal. Moreover, while the State Defendants did not move to place their 389-page medical record under seal, the Court observes that it contains sensitive information related to Reyes's mental health history. *See* ECF No. 22-1. Therefore, it too shall be placed under seal.

[5] Hemopneumopericardium refers to the occurrence of blood and air in the pericardial space. *See* http://medical-dictionary.thefreedictionary.com/hemopneupericardium.

since his discharge from Kernan Rehabilitative Hospital ("Kernan"), he was not provided Oxycodone for five days after his movement to JCI, and he was not provided out-patient therapy as recommended. ECF No. 1 at pp. 14-16.

Reyes complains that since housed at MCIH he has filed three sick-call requests complaining that he has not received physical therapy and has experienced ongoing pain, but has not received nerve pain medication. *Id*. at p. 16; ECF No. 1-2 at Decl. He claims that Defendants have been deliberately indifferent to his medical needs.

**II. Standard of Review**

Defendants' Motions are styled as a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) or, in the Alternative, for Summary Judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an

obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[6]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167. The Court is more than satisfied that given the volume of exhibits presented here, it has ample information with which to address the motions as filed for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

[6] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original). In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to…the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). But, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.

In the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because Reyes is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the Court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## III. Discussion

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lanta v. Angeline*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seater*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.[7] *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicted…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer*, 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown*, 240 F. 3d at 390; citing *Liege v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken). Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LaFevers*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

[7] A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241, citing to *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999).

Further, § 1983 medical liability on the part of the State Defendants requires a showing that: "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990) (internal citations omitted).

PA Moss submits that Reyes is a twenty-seven year old man who has a medical history "significant for multiple stab wounds sustained while imprisoned." ECF No. 16-4 at Ottey Aff. On December 7, 2012, he was seen by Nurse Salami after he received multiple stab wounds in his chest and back. Reyes was placed on oxygen, transferred to the prison dispensary, and taken to University of Maryland Medical System's ("UMMS") shock trauma unit. ECF No. 15-2 at pp. 1 & 155-156. The record shows that he remained verbally responsive and alert. *Id*.

While at UMMS, Reyes's wounds were sutured and he was placed on a Fentanyl drip.[8] An MRI showed a spinal contusion at the C4-C5 disc. He also received heart surgery related to the stab wounds and was subsequently transferred to the UMMS Intensive Care Unit ("ICU"). *Id*., at 157-158. On December 11, 2012, an evaluation conducted at UMMS showed that Reyes required moderate assistance with gait movement and activities of daily living ("ADL") and it was recommended that he receive spinal cord rehabilitation at Kernan. *Id*. at pp. 157-160. The next day Reyes was transferred to Kernan for spinal cord rehabilitation. It was noted that he had a T-3-T4 penetrating stab and a hemorrhagic contusion of the C4-C5 spine. *Id*. at pp. 161-168.

[8] Fentanyl is an opioid medication used as part of anesthesia to help prevent pain after surgery or other medical procedure. *See* http://www.drugs.com/fentanyl.html.

Occupational therapy was recommended to maximize Reyes's safety and independence. ECF No. 15-2 at pp. 161-168.

From December 12 through December 21, 2012, Reyes received inpatient occupational therapy at Kernan for one to two hours a day, for five to six days a week. It was observed that he was making good functional gains and was ambulatory with a rolling walker. *Id*. generally at pp. 181-260. On December 24, 2012, Reyes was admitted to the Department of Public Safety and Correctional Services ("DPSCS") regional infirmary with a diagnosis of incomplete tetraplegic spinal cord injury of the cervical region with gait disturbance. He was ambulating with assistance (a walker), but was deemed to be a "high fall risk" secondary to right-sided weakness. *Id*. at p. 2. Seen by PA Abubaker on December 24, 2012, Reyes complained of chest pain at the surgical site and right shoulder and lower back pain. His strength was found to be four out of the maximum five in all extremities. *Id*. at pp. 3-4.

On January 10, 2013, Reyes received a cane for walking. *Id*. at p. 176. He remained in the regional infirmary through January 17, 2013, when he was discharged to JCI. While in the infirmary, Reyes complained of an "infected" toe, general pain, the inadequacy of a stool softener, and his need for pain medication. He received daily evaluations from nurses and physicians, was prescribed Lyrica and Motrin for pain, and was provided a walker for ambulation. *Id*. generally at pp. 10-76. On January 3 and January 4, 2013, however, Reyes denied suffering pain and was observed by Dr. Ayalew ambulating without difficulty without a walker. *Id*. at pp. 47-48, 52-53 & 66. When he was discharged from the infirmary, Dr. Ayalew noted that Reyes had made significant improvement and was able to perform all ADLs independently. *Id*. at pp. 72-73. Nonetheless, Ayalew recommended that Reyes receive physical

therapy for three weeks and that he may use a cane and ace wrap until he was more comfortable. ECF No. 15-2 at pp. 72-73.

On January 17, 2013, Reyes was transferred to JCI. That day he submitted a sick-call slip requesting a cane and a diet change. *Id*. at p. 262. On January 30, 2013, he was seen by Nurse Practitioner Mijere. His medications were renewed, but Mijere noted that Reyes had completed therapy at Kernan as of January 2, 2013, and did not have a history of any falls. *Id*. at pp. 79-80. A non-formulary drug request form was completed by a JCI physician. *Id*. at pp. 81-82.

On February 5, 2013, Reyes was seen by PA Moss. He related no complaints regarding his cane or associated concerns, but did claim he was experiencing cold symptoms. *Id*. at pp. 83-84. On February 20, 2013, Reyes was seen by Moss for his request for a bottom-bunk assignment, as he complained of leg weakness and chest pressure when jumping down from top bunk. ECF No. 15-2 at pp. 85-86, 162 & 261. He made no mention of requiring a cane. Moss noted that he had observed Reyes on several occasions ambulating to and from the medical room without any assistance devices and noted that bottom-bunk status was not indicated for Reyes at that time. *Id*.

On or about April 4, 2013, Reyes was transferred to MCIH. *Id*. at p. 89. On April 14, 2013, Reyes was seen by Nurse Smith for complaints of back pain. He reported that his right foot went numb at times and expressed an interest in working out, but otherwise raised no claims of back pain during the medical visit. He was referred to a provider for further evaluation. *Id*. at pp. 91-93. Four days later, on April 18, 2013, Reyes was seen by PA Sampong for a complaint of back pain. Sampong prescribed Baclofen and Naproxen for the pain, which Reyes reported was a six on a scale of one to ten. *Id*. at pp. 94-95.

On May 24, 2013, Reyes was again seen by Sampong for reported "light" chest pain. He demanded to be seen for a follow-up visit related to his heart surgery. Reyes denied palpation, chest or back pain, and general weakness during this visit. Sampong reviewed Reyes's chart and observed that no follow-up appointments were recommended for Reyes's heart. Reyes became argumentative and threatened to sue Sampong. ECF No. 15-2 at pp. 98-99.

Moss alleges that after Reyes's May 2013 visit with Sampong, he raised no complaints secondary to his stab wounds, except generalized back pain and chest discomfort for which he was prescribed Motrin, Meloxicam, Neurontin and Baclofen.[9] *Id*. generally at pp. 94-154. Further, it is argued that Reyes has not requested medical assignments for a cane or bottom-bunk status, his gait has consistently been observed by evaluating healthcare staff to be steady and within normal limits, and he continues to have access to prison medical staff through the sick-call process. ECF No. 16-4 at Ottey Aff.

In his opposition, Reyes claims that on January 15, 2013 he was wheeled into the prison dispensary for complaints of chest pain. ECF No. 20. He complains that Moss is excluding exhibits which show he arrived at JCI before January 17, 2013, and complained of chest pain. He states that the only treatment he received after leaving Kernan was "self-care" and observation. Reyes maintains that he was provided no physical therapy and even after observing his slow and stumbling gait and his subjective claim that his leg sometimes gave out, medical

---

[9] Meloxicam or Mobic is a nonsteroidal anti-inflammatory drug ("NSAID"). It works by reducing hormones that cause inflammation and pain in the body. *See* http://www.drugs.com/meloxicam.html. Neurontin (gabapentin) is an anti-epileptic medication, also called an anti-convulsant. Gabapentin affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. *See* http://www.drugs.com/neurontin. Baclofen is a muscle relaxer and an antispastic agent used to treat muscle symptoms including spasm, pain, and stiffness. *See* http://www.drugs.com/baclofen.html.

staff did not provide him a requested cane. He further argues that he filed sick-call slips requesting the return of his single-point cane and Moss was well aware of this. ECF No. 20.

In reply, Moss incorporates the arguments raised in his dispositive motion. In effect, he argues that he was not indifferent to Reyes's medical needs as when he saw Reyes, Reyes did not reference a need for a cane, nor was he observed to be in need of a device to ambulate. ECF No. 24.

State Defendants Maryland Department of Corrections, Dovey[10] and Wolfe's Memorandum in support of their dispositive Motion echoes that of PA Moss. They maintain that on December 6, 2012, Reyes was transferred to JCI and the following day, on December 7, 2012, he was found on the lower tier of JCI's "F Building." He had been assaulted and was found to have two puncture stab wounds on his chest and three puncture stab wounds on his upper back. ECF No. 22-3 at p. 306. He was transported by ambulance to UMMS Shock Trauma Unit where his wounds were sutured and he received heart surgery. On December 12, 2012, Reyes was the transported to Kernan, where he received daily inpatient therapy until December 21, 2012, before he was transferred to the DPSCS Jessup regional infirmary on December 24, 2012. On January 10, 2013, he was provided a cane. He remained a patient in the infirmary until January 17, 2013, when he was moved to JCI. *Id*.

The State Defendants assert that Reyes filed three administrative remedy procedure ("ARP") grievances while housed at the MCIH, concerning a cyst on his ring finger; pain in his back, left foot, and left hand; and a violation of his Eighth Amendment rights as pertaining to the issues raised in this civil case, ECF No. 22-6 at Hartle Decl. & ECF No. 22-7, but did not file any ARPs during the brief time period he was housed at JCI. ECF No. 22-5 at Sellman Decl.

[10] Dovey is the former Warden at JCI. In September of 2015, he was replaced by Keith Lyons. ECF No. 22 at n. 3.

They further argue that Reyes did not file any grievance appeals to the Inmate Grievance Office ("IGO"). ECF No. 22-8 at Oakley Decl.

The State Defendants assert that medical treatment for inmates is administered by private health care professionals contracted by the State. They argue that they have no personal involvement in Reyes's medical care and he has provided no evidence that they interfered with his treatment.

## IV. Analysis

The State Defendants raise several affirmative defenses: the failure to exhaust available administrative remedies, respondeat superior, statute of limitations, and qualified immunity. The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

For purposes of the Prison Litigation Reform Act of 1995, 42 U.S.C. §1997e ("PRLA"), "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to

exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F.Supp.2d 523, 530 (D. Md. 2003), *aff'd* 98 Fed. Appx. 253 (4th Cir. 2004); *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Courts have no discretion to dispense of the exhaustion requirement in lawsuits where the PLRA applies, and a case must be dismissed where it is apparent that an inmate failed to properly exhaust available administrative remedies before filing suit. *See Woodford v. Neo*, 548 U.S. 81, 89 (2006). The Supreme Court has noted that if an inmate could properly exhaust his claims without complying with the procedural rules of the prison's grievance system, a prisoner could avoid the entire prisoner grievance process by simply filing a prison grievance he knows would be dismissed for procedural deficiency. *Id*. at 96. To prevent this type of abuse, the Fourth Circuit has held that an inmate must follow the required procedural steps in order to

exhaust his administrative remedies, and return of an improperly filed grievance specifically does not serve to exhaust a prisoner's administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see also Langford v. Couch,* 50 F.Supp.2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory.").

Administrative remedies must, however, be available to the inmate and this Court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). The Fourth Circuit has addressed the meaning of "available" remedies in *Moore,* 517 F. 3d at 725:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*See also Blake v. Ross,* 987 F.3d 693, 698-701 (4th Cir. 2015), *cert. granted*, *Ross v. Blake,* 136 S. Ct. 614 (2015) (review of whether there is common law "special circumstances" exception to the PLRA that relieves an inmate of his mandatory obligation to exhaust administrative remedies when the inmate erroneously believes that he satisfied exhaustion by participating in an internal investigation).

In Maryland, filing a request for administrative remedy with the warden of the prison is the first of three steps in the ARP process. *See* COMAR 12.07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the

inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A. If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Corrections. COMAR 12.07.01.05C; *Blake v. Ross*, 787 F.3d at 697. If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office ("IGO"). *See* C.S. §§ 10-206, 10-210; COMAR 12 07.01.03; COMAR 12.07.01.05B. Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06A. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)-(c).

Reyes does not refute the evidence which shows that, while he did grieve the issues raised herein through an ARP, he did not exhaust the remedy prior to filing his lawsuit by filing an appeal to the IGO. Reyes seemingly acknowledges that he did not fully complete the exhaustion process or was otherwise estopped from filing a grievance.[11] This Court must

---

[11] Indeed , in his Motion to Stay, Reyes indicates that he was "now going to submit the copy of the ARP [referenced in the State Defendants' Motion for Summary Judgment] …to the IGO." ECF No. 25.

dismiss his lawsuit against the State Defendants with prejudice as Reyes's claims against the State Defendants are barred by the PLRA from litigation in this Court.

Even if Reyes had properly exhausted his administrative remedies, summary judgment in favor of the State Defendants would be appropriate because the pleadings, declarations, and exhibits on file demonstrate that they did not violate his constitutional rights. The undisputed record shows that they did not interfere with Reyes's medical care.[12] *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Miltier*, 896 F. 2d at 854.

Reyes's medical claims against Moss are likewise subject to dismissal. The record is clear that Reyes suffered grave injuries from the December 2012 inmate stabbing and received immediate care, in the form of surgery and rehabilitative services, over the course of the ensuing weeks. He recuperated well and was found to have made an excellent recovery. The record presented establishes that medical providers did not refuse to provide him pain medication or otherwise deny him ambulatory devices deemed objectively necessary. Reyes was repeatedly examined and treated by nurses, PAs, and doctors. The record evidence indicates that his requests and needs were considered and addressed.

A constitution violation cannot be made given the facts of this case. Summary judgment will be entered in favor of Moss, Department of Corrections, Dovey and Wolfe in a separate

---

[12] The State Defendants assert that the Maryland Department of Corrections ("DOC") is not a person within the meaning of 42 U.S.C. § 1983 and the State of Maryland has not waived its sovereign immunity under the Eleventh Amendment to suit in federal court. I concur with this affirmative defense. Defendant DOC is a state agency operating as a division of the Maryland DPSCS. *See* Md. Code. Ann., Corr. Servs., Art., §§ 1-101(g) and 3-201. Neither a state nor an agency of a state is a "person" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64-65 & 70-71 (1989). Moreover, state agencies are immune from liability under the Eleventh Amendment from a § 1983 suit in federal court without regard to the nature of the relief sought. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-01 (1984); *C.H. v. Oliva*, 226 F.3d 198, 201 (3rd Cir. 2000). Consequently, the Complaint against DOC is subject to dismissal for want of jurisdiction.

Order to follow.[13] The Complaint against PA Richards and "John Doe" Defendants shall also be dismissed.

Date: February 10, 2016

/s/
William M. Nickerson
Senior United States District Judge

[13] In light of this decision, the Court need not evaluate the statute of limitations or qualified immunity defenses raised by the State Defendants.